UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

FILED
2023 FEB 22 P 2: 53
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STATE OF RHODE ISLAND | : | No. 1:23-cr- |
| V. | : | |
| DAMION EVERETT | : | Rhode Island Superior Court<br>W3-2019-0269A |
| COREY JOHNSON | : | W3-2019-0264A |
| IRVING (ROCKY) JOHNSON | : | W3-2021-0030A |

## NOTICE OF REMOVAL OF CRIMINAL PROSECUTION

*"Then render to Caesar the things that are Caesar's; and to God the things that are God's"*
(Matthew 22:21 NASB)

## INTRODUCTION

Now Come Defendants Damion Everett ("Mr. Everett"), Corey Johnson ("Mr. Corey Johnson"), and Irving "Rocky" Johnson ("Mr. Rocky Johnson"), by and through their attorneys, and hereby remove the above-captioned matters from the Rhode Island Superior Court, Washington County, pursuant to 28 U.S.C. §1443 (1) and 25 U.S.C. §1301 *et seq.*, and 42 U.S.C. §§1981 and 1985(3). The Defendants respectfully aver that this Notice and attached exhibits demonstrate on the face sufficient grounds to warrant removal, and request an evidentiary hearing pursuant to 28 U.S.C. §1455(b)(5).[1]

---

[1] Defendants acknowledge that they file this Notice well beyond the thirty (30) days after arraignment prescribed in the 28 U.S.C. §1455(b) and submit a Motion for Leave to File Untimely Notice of Removal in which they set down the facts and arguments supporting good cause for the Court to allow them to file this Notice out of time.

1

Defendants will categorically be denied their fundamental rights under the Indian Civil Rights Act, 25 U.S.C. §1301 *et seq.* ("ICRA") if the prosecution remains in state court. Section 1302(a)(8) of the Indian Civil Rights Act establishes that a tribal government may not "deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law." Defendants allege that this abrogation of their rights under ICRA manifests in two ways: 1) the internal Tribal governance issues underlying this criminal prosecution have resulted in a severe violation of Defendants' due process rights by the executive branch of Tribal Government; and 2) continued prosecution in state court effectively weakens the only appropriate arbiter of the facts and law pertinent to Defendants' ICRA claims - the Tribal Court.

Continued prosecution of this matter in any tribunal of the state judiciary also ensures that Defendants will be denied "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens" in contravention of 42 U.S.C. §1981.

In support of their Motion, Defendants incorporate the following facts and points of law.

1. This Court has jurisdiction under 28 U.S.C. §1443(1), 25 U.S.C. §1301 *et seq.* and 42 U.S.C. §§1981.
2. The District of Rhode Island is the proper venue for this Removal as the prosecution is pending in the State of Rhode Island.
3. Defendants Damion Everett, Corey Johnson, and Irving Rocky Johnson are enrolled members of the Narragansett Indian Tribe and all three have participated in the civic life of their Tribe in different ways over the years.

4. As early as 2016, Mr. Everett and Mr. Rocky Johnson communicated with Tribal Government about the creation of Tribal Trusts and requested to meet with Tribal Leadership to discuss what this meant.

5. On January 10 and January 31, 2019 William Devereaux, Esq. sent letters to Mr. Everett and Mr. Rocky Johnson claiming that "the laws governing Tribal membership with the Narragansett Indian Tribe do not allow membership in two tribes" and that Defendants' "membership status [was] considered in question." Exhibit A. Attorney Devereaux did not cite any sources of authority from Tribal Law or officials in these letters.

6. The letters from Attorney Devereaux also purported to ban Mr. Everett and Mr. Rocky Johnson from attending any Tribal meetings. *Id.*

7. Chief Sachem Dean Stanton's testimony during these criminal proceedings was at best ambiguous as to whether he consulted the Tribal Council before asking the Tribe's Attorney to draft the letters banning Mr. Everett and Mr. Rocky Johnson from Tribal meetings. Trial Tr. 63:3 - 64:30.

8. At the time the Tribe's attorney sent the letter to Defendants Everett and Rocky Johnson regarding their status as Tribal members, there were no formal policies, rules, or references in the Tribe's Constitution to dual membership or to whether it is allowed or not allowed under Narragansett Indian Tribe Tribal Codes.

9. On February 17, 2019 Tribal Court Judge Denise Dowdell sent a Memorandum to the Tribal Council, copied to the Chief Sachem, advising that "a tribal attorney does not have the right or responsibility to supplant the Tribal Court on behalf of the Tribal Government regarding TRO's." Exhibit B at 4.

10. In its memo, the Tribal Court also referred to the attorney's "non-judicial letter" to Defendants as a "stalemate" and questioned "the Tribal Government's reliance on the Tribal police to protect the Tribe from the seeds of discontent that the Government itself has sown." *Id.*

11. Judge Dowdell characterized the Government's actions as "contrary to the sworn duty" to which the Chief Sachem and Council had attested to uphold. *Id.*

12. The Court's memo also warned the Council and Chief Sachem of placing the Tribal police "in harm's way and thrown into a debacle about rights." *Id.* at 4-5.

13. In the memo, Judge Dowdell warned the Tribal Government that "should the [Tribal Police] Department require back-up from local jurisdictions, the Tribal Government will not have a solid legal argument to seek outside prosecution." *Id.* at 5. According to the Court, "a legal loophole / argument can be made that any physical altercation / harm is political in nature." *Id.*

14. The Memo included a directive from the Tribal Court to the Tribal Government to remove the restraint against these individuals and to place the issue for discussion at a Tribal Assembly meeting. *Id.* at 7.

15. The Tribal Council meeting minutes offered into evidence by the State contain no evidence of the Tribal Council being consulted about, much less authorizing, any restraint of these Defendants from the Tribal meeting.

16. Neither the Chief Sachem, the Tribal Council, nor any representative of Tribal Government followed the Tribal Court's directive to discuss the issue at a Tribal Assembly meeting.

17. Instead of scheduling a Tribal Assembly or attempting any communication at all with Mr. Everett or Mr. Rocky Johnson, the Tribal Government scheduled a referendum for Tribal members to vote on a question of dual membership on April 20, 2019.

18. The election was held on April 20, 2019 with eighty-seven (87) members voting in favor and sixty-six (66) voting against a resolution stating that if a "member of the Tribe elects to self-identify with a separate indigenous tribe, group, splinter group, or band, that individual ... is no longer eligible and does not have the right to participate in the internal, political, and/or governmental affairs of the Narragansett Indian Tribe." Trial Tr. 73:18-24.

19. After twenty-one (21) months without a Tribal Assembly meeting, and despite countless requests by Defendants to hold a Tribal Assembly meeting, Tribal Government finally called such a meeting to be held on April 27, 2019, one week after the referendum.

20. In the week following the referendum, Narragansett Tribal Police Chief Antone Monroe ("Tribal Police Chief Monroe" or "Police Chief Monroe") contacted Charlestown Police to ask for assistance because of potential disruption at the meeting.

21. Police Chief Monroe admitted at the trial in this matter that he had no specific knowledge of any potential threats of violence or disruption at the Tribal Meeting. Tr. 268:7 - 269:1.

22. Tribal Court Judge Dowdell issued a document titled "Notice" and referencing "Application of Referendum Vote." Exhibit C. The document was dated April 25, 2019 and addressed to Wayne Everett, Damion Everett, and Rocky Johnson.

23. The Application Notice states that "It is the Tribe's expectation that you will no longer seek participation nor allowed (sic) admittance into Assembly proceedings or any other

deliberative or political tribal matters." The Notice includes no information related to questioning or appealing the Court's statement.

24. At trial, Tribal Police Chief Monroe was not able to recall when the notice was mailed out to Mr. Damion Everett or Mr. Rocky Johnson, although he insisted that the notice dated April 25 was mailed out "a week or more before" the April 27 meeting. Trial Tr. 282:10-21.

25. Tribal Police Chief Monroe thought the notice might have been sent by certified mail but could not recall, nor did he have any receipts to document if or when it was sent to Mr. Everett or Mr. Rocky Johnson. 283:10 - 284:7.

26. Police Chief Monroe and Chief Sachem Stanton met with Charlestown Police two days before the meeting, on April 25. Charlestown police created an Operations Plan to organize their deployment at the Tribal meeting.

27. Mr. Everett, Mr. Corey Johnson, and Mr. Rocky Johnson arrived at the meeting with family members and other Tribal Members to participate in the governance of their Tribe.

28. As the main parking lot was blocked off by Charlestown police, Defendants and others parked in a back parking lot near the basketball courts on Tribal Land. According to Tribal police officer Nelson Hazard in his testimony at trial, it is customary for Tribal members to use this parking lot as overflow, and there is nothing sinister about parking in that area.

29. Nonetheless, Lieutenant Philip Gingerella ("Lt. Gingerella") through testimony and a written narrative repeated the trope of a group of Indians, suddenly appearing out of the woods as a hostile and potentially dangerous development.

30. Upon reaching the Four Winds Community Center on Tribal Trust lands, Defendants saw approximately eight (8) to ten (10) members of the Charlestown Police and the Rhode Island State Police.

31. At the entrance to the community center, Tribal Police officer Nelson Hazard told Defendants Mr. Everett and Mr. Rocky Johnson that they were not allowed to enter the meeting site.

32. A number of Tribal members, both in support of and opposed to these Defendants' position on internal Tribal governance matters, converged at the entrance to the community center and a fair amount of pushing and shoving took place before Tribal members inside the meeting room succeeded in opening the doors to allow Mr. Everett, Mr. Rocky Johnson, and other members who were not included in the Tribal Court's notice, to enter the meeting.

33. During the commotion, Charlestown police officer David Westervelt grabbed Mr. Everett in a "horse collar tackle," a move banned by the National Football League in 2005 due to significant risk of injury to bones and ligaments of the legs, knees, and ankles as the tackled player's weight comes down on one or both legs.

34. Tribal Scout Earl Stanton tackled Mr. Rocky Johnson and threw him onto the floor inside the meeting room; however state, local and Tribal law enforcement declined to prosecute this assault even though they observed it firsthand.

35. After entering the meeting room, Defendants and other Tribal members approached the head table to speak with Chief Sachem Stanton and Council members.

36. Mr. Rocky Johnson found an empty chair, sat down, and waited for the meeting to start, as Mr. Corey Johnson, Mr. Everett, and other Tribal members gathered around in support.

37. The meeting never started however, as Chief Sachem Stanton left, and eventually Defendants left the meeting room.

38. According to the Chief Sachem, the decision whether or not to seek participation from Charlestown police is "not [his] call ... because that's why the Tribe has its own chief of police. That is [the Tribal Police chief's] call to make." Trial Tr. 122: 10-17.

39. Testifying at trial, Tribal Police Chief Antone Monroe acknowledged that he has authority to make arrests for violations of state law. Trial Tr. 64:19-65:1.

40. On May 1, Charlestown police requested Defendants to present themselves at the Charlestown police station. Defendants complied with the request, and at that meeting Charlestown police arrested Defendants.

41. The Town initiated the prosecution against each Defendant in Rhode Island District Court on May 16 (Irving Johnson) and May 23 (Damion Everett, Corey Johnson), 2019.

42. Defendants stand charged with one count each of the following four misdemeanor and petty misdemeanor offenses: Simple Assault and/or Battery (R.I. Gen. Law §11-5-3); Disorderly Conduct (§11-45-1(a)); Obstructing a Police Officer (§11-32-1); and Disturbing a Meeting (§11-11-1).

43. At some point before May 13, 2019 Charlestown Police Chief Michael Paliotta received fifty-six (65) pages of documents from an unknown individual or individuals within the Tribe concerning this internal dispute, which he forwarded to the Town prosecutor on May 13, 2019.

44. A summary of the case travel is provided in the docket summaries of each Defendant's Superior Court Case, attached as exhibits to Defendants' Motion for Leave to File an Untimely Notice of Removal.

45. Early in the travel of his case, Mr. Rocky Johnson challenged personal jurisdiction in this matter by filing a Motion to Dismiss for Lack of Personal Jurisdiction. Exhibit D, Memorandum of Law in Support of Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (41-19-00987, June 6, 2019).

46. The Hon. J. Thunberg has not yet ruled on Mr. Rocky Johnson's Motion to Dismiss.

47. Mr. Everett wishes to pursue a Motion to Dismiss on identical grounds.

48. The issues presented in that Motion relate to the facts and internal governance dispute that gave rise to the criminal matter at bar.

49. In this and other matters, local and Tribal law enforcement officials have demonstrated a profound lack of clarity and consistency as to their understandings of the authority of Tribal police to make arrests for alleged violations of state law on Tribal lands.

50. Lieutenant Philip Gingerella ("Lt. Gingerella"), one of the highest ranking officials of the Charlestown Police Department, acknowledged in his testimony at the trial in this matter that Tribal Police can arrest Tribal members on Tribal land. Trial Tr., Nov. 3, 2022, 12:10-13.

51. When asked if he believes whether Tribal police can arrest Tribal members on Tribal lands for violations of state law, Lt. Gingerella responded, "I'm not sure about that. I believe it's federal law because they'd be charging them federally, not state. But that -- on that particular matter, I'm not sure." Trial Tr. 12:14-19.

52. Tribal Police Chief Monroe testified that he has, on occasion, brought matters involving state criminal charges such as disorderly conduct to Tribal Court. Trial Tr. 271:5-13.

53. Police Chief Monroe has brought such cases to Tribal Court in order to utilize the Tribal Court's power to institute sanctions against individual members, and he has found the

process to work well and would be inclined to use it again "if [he] had to." Trial Tr. 271:14-22.

54. In this matter, according to Police Chief Monroe's testimony at trial, he had the authority and "made the decision" to "let Charlestown take the case," or, in less polished terms, that he "handed [Defendants] over" to Charlestown police. Trial Tr. 273:7-20.

55. Police Chief Monroe testified that the reason he decided to "hand them over" to Charlestown for arrest and prosecution instead of referring Defendants to Tribal Court is because "Tribal Court couldn't handle that," and assigned responsibility to Judge Dowdell, saying "she's not hearing criminal cases right now." Trial Tr. 274:2.

56. Defendants' ability to explore the issue on cross-examination was severely restricted, as demonstrated when Mr. Rocky Johnson's counsel attempted to question Tribal Police Chief Monroe on whether Tribal Police "have the authority, legally, to enforce State criminal law." The Court sustained the State's objection, on the grounds of "materiality and relevance," stating that the line of questioning was "about the establishment of state jurisdiction ... of Tribal law according to the Joint Memorandum." Trial Tr. 263:19 - 264:16.

57. Other statements and actions by local, state, and Tribal law enforcement officials demonstrate at best confusion, and at worst antiquated stereotypes that influence their prosecution or lack thereof of alleged violations of state law by Tribal members on Tribal lands, particularly in situations such as the case at bar, where crimes charges arise from internal Tribal governance disputes.

58. Charlestown Police Chief Michael Paliotta ("Charlestown Chief Paliotta") recently testified at deposition in another matter to his understanding that if Tribal police arrest a

person for violating state law on Tribal land, they may detain the individual and then "local law enforcement or State Police would handle the prosecution." Exhibit E, Deposition of Michael J. Paliotta, *Monroe v. McQuaide et al.*, 1:20-cv-306-WES-PAS, 39:23 - 40:7.

59. Charlestown Chief Paliotta also testified in that matter that Tribal police could enforce federal laws on Tribal land, with assistance from federal law enforcement. *Id.* at 40:9-22.

60. However, the notion of federal law enforcement authority on Narragansett Tribal Trust land has been thoroughly discredited, as state and federal law clearly provide that Tribal lands "shall be subject to the civil and criminal laws of the state of Rhode Island." R.I. Gen. Laws §37-18-13(b); 25 U.S.C. §1708. *See e.g.*, *United States v. Troy Simonds*. CR14-134-ML, D.R.I.[2].

61. Charlestown Chief Paliotta also has testified as to his understanding that Tribal police could arrest and "go through their own court system" as to Tribal members on Tribal land, although he was not aware of any such instances having occurred. Exhibit E at 41:9-22.

62. Charlestown Chief Paliotta, in his analysis, distinguished between "victimless crimes" and "crimes with a victim" and testified that "there may be an avenue there for them to do some type of a -- an action for -- in front of a Tribal Court" although he had not seen that and did not know if such an avenue exists. *Id.* at 43:4 - 44:22.

63. In Charlestown Chief 's analysis, if Tribal and local police did not agree on the proper forum for prosecution, then Charlestown police would "probably use the Attorney

---

[2] Defendant moved to dismiss a federal indictment arguing that the Settlement Act established *state* criminal jurisdiction on Tribal land, not federal, and that the power to enforce criminal law therefore lay exclusively with the State. *Id.* Defendant further argued that the Tribal Lands did not qualify as Indian Country pursuant to 18 U.S.C. §1152. *Id.* After defendant's motion, the federal government dismissed the indictment under F.R.Cr.P. 48(a).

General's Office or solicitors to help [the Town], you know, put -- prosecute in the proper court system," *Id.* 44:23-45:16.

64. Under Charlestown Chief Paliotta's scenario, "Tribal Police or members of the tribal government would be witnesses, would fill out statements, (and) would testify" in state court; however he identifies no role for the Tribal Court. *Id.* 45:13-16.

65. Were there a "contentious issue and there was a state law involved, you know, either the Charlestown Police or the State Police could just take charge of it and do what they needed to do and enforce state law" according to Charlestown Chief Paliotta's understanding. *Id.* 46:24 - 47:3.

66. Tribal Police Chief Monroe, on the other hand, related a different understanding of Tribal versus local law enforcement authority: "[I]t's my choice to charge tribal, to take it tribal, to take it state, or to take it federal. That's my, that's my choice." Trial Tr. 272:5-7.

67. The Rhode Island Department of Attorney General, in a meeting with other local, state, and federal law enforcement officials on March 3, 2017 declined to prosecute any Tribal members relative to an internally disputed occupation of the Tribal Administration building in late 2016 because it was "unclear who has the right to enter Tribal buildings." Exhibit F, Email, (former) Charlestown Police Chief Jeffrey Allen to (former) Town Administrator Mark Stankiewicz, March 6, 2017.

68. In a Chambers Conference early in the travel of this matter through Superior Court, the Assistant Attorney General prosecuting Defendants demonstrated the incongruity of the State's involvement in this case when he described the Tribal members involved in the different sides of this internal dispute by saying, "They're all children."

For the reasons stated herein, Defendants seek to remove this matter.

                                      Defendants **DAMION EVERETT, COREY JOHNSON, and IRVING ROCKY JOHNSON,**

                                      By their attorneys,

                                      /s/ Shannah Kurland
                                      **Shannah Kurland, Esq.** (#9186)
                                      149 Lenox Avenue
                                      Providence, RI 02907
                                      Phone: (401) 439-0518
                                      skurland.esq@gmail.com

## CERTIFICATION

I hereby certify that on February 22, 2023 I have filed the within document through the Court's ECM/EF system, where it will be available for public viewing. I have also caused the document to be sent *via email only* to:

| | | |
|---|---|---|
| Mark Trovato, Esq. | Lauren Ianelli, Esq. | Glenn Sparr, Esq. |
| mtrovato@riag.ri.gov | liannelli@itwlaw.com | gsparr@verizon.net |
| | | |
| Kristal Jacques | | |
| kjacques@courts.ri.gov | | |

                                        /s/ Shannah Kurland
                                         Shannah Kurland