

# Narragansett Indian Tribal Court

RECEIVED FEB 22 2023 U.S. DISTRICT COURT DISTRICT OF R.I.

TO:     Tribal Council

CC:     Chief Sachem A. Dean Stanton

FROM     Judge Dowdell

DATE:     February 17, 2019

RE:     Tribal Law and the Application of TROs

    The Tribal Police Department has apprised the Court of the development of a potentially dangerous situation that could disrupt the upcoming Assembly Meeting on February 23, 2019 and foreseeably put members of the tribal community in harms' way through attachment of new restraints upon individuals that prevent them from attending tribal meetings without due process.

    If the Court may project how this situation developed, it begins with the Tribal Government's plans to start the New Year off on a good foot, which now goes a rye. The agenda in January included discussion of splitter groups; however, the government was obliged to cancel the meeting because of the death of a well-known tribal member.[1]

---

[1] The Tribe has addressed this topic in the past and opted for requiring assurance that the monthly assembly takes place as scheduled; however, no procedure to pay respects for departed members has been set in place and the Government continues to cancel meetings, which means. The CONSTITUTION AND BY-LAWS, Article III backstops the Tribe's request to conduct a reliable, scheduled basis for Assembly.

  This section begins by stating: "The Bi-annual election of officers shall be held the last Saturday in January." Regarding timing, additional definition is provided in the Profile, which states (under

1

Between last month and this month, it appears that the Government determined to push this issue forward without first meeting with the Tribe to complete the political process. Instead, it has opted to begin restraint activities against identified, splinter group leaders and set about to achieve this objective sought formal service and restraint by the Tribal Police Department. Formal inclusion of the Department to restrain individuals whose actions fall under the legal jurisdiction of the Tribe has caveats. One is the Department may restrain an individual to quell an immediate dangerous situation. The objective in this type of situation is to promote and protect public safety. The second is by Tribal Court Order that provides notice and a hearing.

There remain differences of opinion about the use of customary practices by the Tribal Government in 2019 to achieve its will through coercion. Traditional practices provided greater flexibility for the Tribe's historic leaders to attend situations arising in the moment; however, even customary action had limits set by protocols. *See, for example*, A Key, which describes the earliest written documentation about how the Sachem handled disputes.[2]

---

Date of Election) "Generally, in January, every two years (2) years, depending on seasonal conditions and Tribal determinations." This section concludes: "The regular Tribal meeting shall be held the last Saturday in each month." There is no further clarification in the Profile to explain the customary exception to this rule although one does exist.

Historically, the death of a tribal dignitary would halt the continuation of business, while the Tribe paused to pay its respects and mourn the loss of that person's contribution to the Tribe. Somewhere along the way, the definition of a tribal dignitary expanded to include the member of a large family, whether the deceased person had contributed to the well-being of the Tribe or not. It has now expanded to include any member on the role, whether or not they had regularly participated in tribal affairs or generally known within the community.

Cancelling meetings has become a ritual habit cut off from its' historic root. This circumstance leaves the Tribe at the whim of Death, never knowing when it shall appear and requiring immediate payment from the Tribe as a whole. It is 2019. It is unrealistic to run a government in this fashion. This is task (a procedure) for the government to work out with the Tribe. The question is how can the Tribe pay its respects to departed members without sacrificing the ongoing needs of the living?

[2] The Tribe knows that four hundred plus years ago, the organizational structure of the Tribe was a hereditary monarchy. Even so, Roger Williams observed in Chapter XXII—Of their Government

2

The *Tribal Profile* describes the more recent approach expanded to Council; however, this too is out-of-date.[3] Last revised in 1989, the *Profile* does include mention of tribal codified law, established by joint resolution of the Tribe in 1992. With the creation of its Law and Order Code, the Tribe and its' government removed court functions and serving restraint notice by the Tribal Police to the Tribal Court. Even the Court has boundaries on the actions it may take when using

---

and Justice in A *Key into the Language of America*, that the sachem would not do what the people averse and that *there was an expectation that the people would be protected from harm*. (Italics added.) This expectation for leadership remains, confirmed in the Law and Order Code.

There is a caution when reading historic documents to consider the impact of time and place on an author's perspective. For example, Williams' *Key*, first published in 1643, documents his interactions with and perceptions of the Narragansett people during the Tribe's earliest stages of colonialization. Contemporary scholars have attributed much to the *Key*. Many regard it as "a fair and circumspect record of seventeenth-century Narragansett culture" and "a valuable tool for understanding that culture." See Jennifer Reid, "Roger Williams's Key, Ethnography or Mythology?" in *Rhode Island History* Volume 56 (3), pp. 77-86 (detailing her perspective about the presence and influence of Williams' theology in the impressions written to define native populations he encountered in route to establishing the colony).

There is also suggestion that the state of Rhode Island would not exist if Williams had not written this book. See, http://www.findingrogerwilliam as having bees.com/essays/an-essay-on-a-key-into-the-language-of-america (explaining that in the summer of 1643, when *A Key* was going to press in London, Williams was also there seeking official recognition of the Providence colony to stem encroachment by Massachusetts and Connecticut. The essay author submits, "The *Key's* appearance delighted the crucial powers in London charged with regulating colonial affairs, and led directly a patent legitimizing the Providence Plantations ...."

There is also criticism. Reid suggests that Williams' depiction of the Narragansett system of counting, oratory and government may or may not be accurate due to the influence of European myths and aspirations, which is reminder that mindset can color perspective. Even so, Reid acknowledges the Key's description as the "first English language ethnography of an American Indian people."

By current definition, ethnography equates "with virtually any qualitative research project where the intent is to provide a detailed, in-depth description of everyday life and practice." //brianhoey.com/research/ethnography/. Because of Williams long-term engagement with the Tribe, his description from the viewpoint of a participant observer that depicts the historic role of leadership and the Tribe's expectations about it from 'eye-witnessed observations', William's description suffices as a window into interactions between leadership and Tribe.

[3] As is the measure granted to the tribal Scouts to preserve order at all meetings per the Constitution and By-Laws at Article X. Scouts are limited by manpower, lack of training and federal certification.

service by the Tribal Police. *See* NICCJ, IV-4 (Extraordinary Writs), which outlines the process that is due, e.g. notice and a hearing.

It has come to Court's attention that the Government chooses to sidestep both political and legal process to move resolution of the splinter groups forward. With the assistance of a tribal attorney, the Government has informed named individuals via a letter from a tribal attorney that they may not attend the February meeting. Further content of this communication is not known except for the fact that the Tribal Police have been informed that they are to prevent the entrance of these individuals from attending the meeting and their receipt of one individual's response.[4]

A tribal attorney does not have the right or responsibility to supplant the Tribal Court on behalf of the Tribal Government regarding TROs. One of the named members has indicated his intent to take this matter to the Tribe. Awareness of this growing debacle is not widely circulating in the Tribe. None-the-less, this statement to take it to the Tribe behooves caution at the next public gathering, which probably accounts for the Government's intended reliance on the Tribal Police to protect the Tribe from the seeds of discontent that the Government itself has sown.

This intended action not only offends tribal law as discussed above, it also influences others areas of law. First, it is contrary to the sworn duty recently attested by the Chief Sachem and Council to (1) protect the Narragansett community from unlawful acts, lawlessness and harm, (2) uphold the rights of the Tribal people and community, and (3) keep the peace and maintain harmony within the tribe. *See Memorandum* sent by email from the Tribal Court to Tribal Council on April 25, 2018 re: Oath of Office. Second, it purposefully places the Tribal Police

---

[4] While this document also assumes a right to create a non-judicial order to restrain contact, it also shows the creation of a stalemate.

A

in harms' way and thrown into a debacle about rights. Third, should the Department require backup from local jurisdictions, the Tribal Government will not have a solid legal argument to seek outside prosecution. A legal argument / loophole can be made that any physical altercation / harm is political in nature, which will allow outside prosecution to refrain from interference. The limitation on internal prosecution for criminal acts is already known.. 

The Court understands that there may be frustration since the justice tribal system is incomplete and underfunded. Critical components, a prosecutor and corrections (detention facility), are missing. Moreover, underfunding impacts records security and evidence controls, causes resource deficiencies to support personnel, replace dated software, declining hardware, and outdated equipment and the use of state and federal courts to resolve matter stemming from internal political matters and petty criminal issues have kept the Tribe in an agitated state.

Haphazard planning and implementation retards measured development of the tribal justice system. The challenges faced by the Tribe's two existing components—the tribal court and law enforcement—reveal gaps in policy, implementation strategies to support / uphold the rule of law, certification compliance, and general public safety procedures.

All these issues raise the question where does the Government start, especially since no issue really stands alone as each interconnects here and there and over there and then undercuts another process downstream. The application of the staggered terms and the election rules and procedures are good examples of this corrosive effect of gaps in law, process and procedures.

The status of members who choose to belong to a separate political group while continuing to benefit themselves through the political process and resources of the Narragansett Tribe is a legal question to be answered by the Tribe through a

formal statement of law about the customary practice statement in tribal meeting minutes. The issue to be determined is where does the allegiance of the members who choose to walk two streams at once lay especially considering the oath of affirmation to the Tribe each member is required to take?

When debating and answering this and other issues, the Government would serve the Tribe best by removing information silos and promoting accountability by structuring coordinated effort and process. This approach recalls a quote from Cornell in *Seizing the Future (2005)*, which reiterates what common sense should inform. "Native nations ... do better when they are able to move away from a firefighting, Band-Aids, and factional conflict approach to governance"; however, there is a caveat. The people [need to be] allowed and able to "focus energy less on crisis management and more on developing sustainable solutions to problems." The key questions, the authors suggest, have become what kind of [community] society are we trying to build for the long term, and what decisions should we be making now in support of that objective? The Tribe has already answered these questions in its governing document objectives (1934) and establishment of the Law and Order Code (1992); however, practical application remains a contemporary challenge because the Tribe operates without Unity of Purpose.

There is a resource before the Government to assist the Tribe and leadership to move toward this goal (Unity of Purpose), which involves undertaking comprehensive strategic planning. It is through the CTAS solicitation that ends February 26, with a program start date, if award received, on October 2019. *See* attached flyer.[5]

---

[5] If this approach appears reasonable, a resolution is required to support submission of an application. It will also require committed participation of the Government to see this process through.

6

In the meantime, remove the restraint against these individuals. Reset this issue (splinter groups) as an agenda item for discussion during assembly with the objective of formulating a formal statement of law. This approach will allow the TEC to meet with the Tribe's without unnecessary pressure and heated emotions.